**IT IS ORDERED as set forth below:**

**Date: March 31, 2023**

_____

**Sage M. Sigler**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In Re: | CASE NUMBER: |
| **PAUL ROLAND SAVAGE,** | **20-63153-SMS** |
| Debtor. | CHAPTER 7 |
| **PAUL ROLAND SAVAGE,** | |
| Plaintiff, | |
| v. | ADVERSARY PROCEEDING NUMBER: |
| **EDUCATIONAL CREDIT MANAGEMENT CORPORATION,** | **21-05094-SMS** |
| Defendant. | |

### <u>MEMORANDUM OPINION DISCHARGING STUDENT LOANS</u>

During his 25-year career, Paul Roland Savage's income has averaged less than $14,000

per year. In that time, Mr. Savage's student loan debt has ballooned from roughly $37,000 to over $250,000. It is inconceivable that Mr. Savage's income will increase between now and when he reaches retirement age in the next decade to the extent necessary for Mr. Savage to repay his student loans without bearing undue hardship.

The above-captioned adversary proceeding was commenced by Mr. Savage, seeking to discharge his student loan debt. The Court held a trial on October 27, 2022, and the following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.[1] For the reasons set forth below, the Court will enter judgment for Debtor, discharging his student loans.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a determination of the dischargeability of student loan debt pursuant to 11 U.S.C. § 523(a)(8).

## PROCEDURAL BACKGROUND

Paul Roland Savage ("Debtor" or "Plaintiff") filed a voluntary chapter 7 petition on February 21, 2020 (the "Petition Date"), commencing Bankruptcy Case No. 20-63153 (the "Bankruptcy Case").[2] On May 27, 2020, Navient Solutions, LLC ("Navient") filed proof of claim 1 ("Claim 1") in the Bankruptcy Case asserting that Debtor owed it $212,947.73 as of the Petition Date. To support Claim 1, Navient attached a printout titled "Class-133-Monetary History" and a redacted "Application/Promissory Note."[3] The "Class-133-Monetary History" attached to Claim

---

[1] Any findings of fact that are more properly construed as conclusions of law shall be so construed, and *vice versa*.

[2] Debtor received a discharge of eligible debts on May 19, 2021. Bankruptcy Case, Doc. 96.

[3] But for the redactions, the redacted "Application/Promissory Note" appears to be identical to the unredacted ECMC Exhibit 1 introduced at Trial.

1 shows transaction dates from August 14, 2016 through the Petition Date. The "Declining Balance" column of the "Class-133-Monetary History" shows the balance of the loan increasing from $162,437.07 on the first date to $212,947.73 on the Petition Date.

On August 30, 2021, Debtor filed a complaint *pro se* against Navient seeking a discharge of his student loan debt (the "Complaint," Doc. 1).[4] On September 10, 2021, Navient, acting on behalf of Pennsylvania Higher Education Assistance Authority, filed proof of claim 6 ("Claim 6") in the Bankruptcy Case asserting that Debtor owed it $240,009.79 as of the Petition Date. Attached to Claim 6 were the identical "Application/Promissory Note" attached to Claim 1 and a "Class-133-Monetary History" substantially similar to that attached to Claim 1 except that the transaction dates range from August 23, 2016 through July 9, 2021. The "Declining Balance" column of this "Class-133-Monetary History" shows the balance of the loan increasing from $162,754.22 on the first date to $236,743.03 on the last date.[5]

Educational Credit Management Corporation ("ECMC" or "Defendant") filed a Motion to Intervene in this proceeding on September 21, 2021 (Doc. 3). Navient filed its answer to the Complaint on September 29, 2021 (Doc. 4). The Court granted ECMC's Motion to Intervene on October 21, 2021 (Doc. 6), and ECMC filed its answer to the Complaint immediately thereafter (Doc. 7). On November 12, 2021, ECMC filed a transfer of Claim 6 to ECMC (Bankruptcy Case, Doc. 116). On November 23, 2021, the Court entered an order dismissing Navient from this proceeding pursuant to the agreement between Debtor and Navient (Doc. 18), leaving ECMC as the sole defendant.

The parties completed discovery, and on June 9, 2022, ECMC moved for judgment on the

---

[4] Unless stated otherwise, all docket references are to the adversary proceeding docket.

[5] Debtor has not objected of either of Navient's claims.

pleadings (Doc. 38). Debtor filed his response to ECMC's motion on June 22, 2022 (Doc. 39), and the Court denied ECMC's motion on August 29, 2022 (Doc. 40). On October 5, 2022, the Court approved the parties' *Consolidated Pre-Trial Order* (the "PTO," Doc. 44), which contains facts to which the parties stipulated. The Court held and concluded a trial on the matter on October 27, 2022 (the "Trial").

Present at Trial were Mr. Savage, *pro se*, and Thomas W. Joyce of Jones Cork, LLP on behalf of ECMC. The Court admitted into evidence exhibits related to the loan at issue and Debtor's financial condition, along with Debtor's testimony under oath. A transcript of the Trial was entered onto the docket on November 16, 2022 (the "Transcript" or "Trans.," Doc. 50).

## FINDINGS OF FACT

Debtor's Trial testimony was both credible and truthful. At the time of Trial, Debtor was a 57-year-old man with no mental or physical disabilities other than Type II diabetes, which does not prevent him from working. Trans. 24:22-25:6.

### **<u>The Loan</u>**

Debtor began attending Temple University ("Temple") in 1992. Trans. 25:25; PTO ¶ 11(1). Temple awarded Debtor a degree in Management in May 1997. PTO ¶ 11(2); Trans. 26:2. To finance his education, Debtor obtained multiple student loans that he intended to repay once he graduated and found gainful employment. PTO ¶ 11(3); Trans. 9:24-25. Debtor received the loans as an educational benefit under the Federal Family Education Loan Program. PTO ¶ 11(6-7). Debtor consolidated his loans into the loan at issue in this proceeding on August 26, 1997 (the "Loan"). PTO ¶ 11(8); Trans. 26:24-27:5. The Loan was insured or guaranteed by a governmental unit and made under a program funded in whole or in part by a governmental unit or non-profit institution. PTO ¶ 11(9).

At the time of consolidation in 1997, the Loan balance was $37,381.06. ECMC Ex. 1. By November 15, 2021, the Loan balance had grown to a staggering $242,976.04. PTO ¶ 11(14). By the time of Trial, the Loan balance was approximately $250,000. Trans. 28:4. In the 25 years since earning his degree, Debtor has not made any payments on the Loan. PTO ¶11(18); Trans. 27:16-18. There was no evidence, however, that Debtor was ever in default on the Loan notwithstanding his lack of payments. To the contrary, ECMC indicated that Debtor was enrolled in an income-based repayment program on the Petition Date, which required no payments on the Loan. Trans. 52:4-7.

**Debtor's Work History**

Debtor worked in student health services while attending Temple. Trans. 12:20-21. In the fall of 1996, while still at Temple, Debtor began applying for jobs using online resources such as Monster, CareerBuilder, Dice, Indeed, and Sologig. Trans. 10:5-8. Debtor estimates that he has applied for between 5,000 and 10,000 jobs since 1996, roughly half of which were with staffing agencies. Trans. 10:9-21. In the first year after graduating Temple, Debtor worked various temporary jobs. Trans. 11:1. In the spring of 1998, Verizon Wireless hired Debtor for the first job he considered "permanent." Trans. 11:2-3. After three years at Verizon, Debtor left his position believing there was no room for advancement in the face of ongoing downsizing at the company.[6] Trans. 11:10-11. Debtor worked various temporary jobs before accepting a job with PCFS Mortgage Resources. Trans. 11:17-18. Debtor left PCFS after roughly 18 months to support his sister, who lived out of town, during her divorce. Trans. 11:20-24. Debtor then worked additional temporary jobs until a short stint with AIG. Trans. 11:24-12:2.

---

[6] Debtor testified that the mergers and consolidation among telecommunications companies that created Verizon resulted in redundancies and led to downsizing, limiting his advancement opportunities. Trans. 11:5-11.

Notwithstanding Debtor's attempts to build relationships with the various staffing agencies that employed him over the years, Debtor felt despondent that his efforts all led to the same result: he was underpaid and had no avenues for advancement. Trans. 12:10-15. Weary from his prior unsuccessful attempts to work his way up through various companies, in 2004 Debtor shirked the corporate ladder in favor of working as an independent contractor. Trans. 12:16-18.[7]

In May 2012, Debtor learned of a software support role providing on-site training to companies implementing new software programs. Trans. 12:18-24. Debtor believed he could thrive in the role from his experience working in student health services at Temple. Trans. 12:20-21. And he did. For the next six years, Debtor worked as an independent contractor providing temporary seasonal training to hospital staff as hospitals transitioned from paper to electronic records. Trans. 13:1-5. After the software was customized for the hospital and its employees were trained, Debtor provided "elbow support" to staff as they used the new system. Trans. 13:8-17.

This job was Debtor's most lucrative since graduating Temple. In the performance of his duties, Debtor traveled throughout the country and was compensated relatively well for his work. Trans. 13:18-20. Debtor entered into various employment contracts during the course of this work, and he submitted his contracts to a prepaid legal provider for review. Trans. 13:22-14:3. Debtor believed that he was entitled to overtime pay, but his prepaid legal counsel repeatedly assured him that, under his contracts, he was not. Trans. 14:3-6.

During this time, Debtor estimates that he was paid, on average, $55 per hour with no overtime even though he would average 44 hours of overtime each week. Trans. 14:23-15:1. Debtor estimates that he was underpaid $348,000 over the course of his six years in software

---

[7] From 2008 to 2014, Debtor obtained additional student loans and attended DeVry University, which awarded him a degree in Human Resources. Trans. 28:5-15. The loan or loans Debtor received to attend DeVry University are likely held by the U.S. Department of Education. Trans. 28:16-18. In any event, the DeVry loans are not held by ECMC and are not the subject of this proceeding.

support.[8] Trans. 15:1-7. In 2016, Debtor learned that several of the staffing agencies he worked with were being sued for failure to pay overtime. Trans. 14:7-9. Debtor joined several successful class action lawsuits against his former employers, but Debtor's personal compensation from the suits was relatively small. Trans. 14:11-13.

In late 2016 or early 2017, Debtor learned of a job through HCTec, one of the staffing agencies with which he had a preexisting relationship, at a new call center to support Epic's medical record software division.[9] Trans. 15:8-18. Debtor's pay was $30 per hour versus the $55 per hour he earned previously, but this position came with an opportunity to become certified in a module of Epic's software, which could lead to better job opportunities. Trans. 15:12-24. Six months after Debtor started at the call center, he began certification training in Wisconsin. Trans. 16:5-8; 17:9. Unfortunately, he learned that Epiq would only give him 30 days to pass the tests necessary for certification instead of the 6 to 12 months that hospitals usually gave their employees. Trans. 16:21-17:4. Debtor also learned that his employer had no plan in place for employees who failed to certify within 30 days and believed he would be terminated if he was not certified within that time. Trans. 17:4-8. So, Debtor attempted to obtain the certification within the allowed 30 days.

After 30 days of training, Debtor failed his first certification test. He received a 30-day extension, but was fired shortly thereafter.[10] Trans. 17:10-11, 40:18. Debtor believes that, given enough time, he could have obtained the certification and become an analyst or a database builder

---

[8] Debtor's estimate assumed that he would be paid the overtime rate for all hours worked, so the total is likely less than $348,000. Nevertheless, Debtor believes he missed out on income to which he was entitled based upon the legal advice he received.

[9] The Court assumes that "Epic" is Epic Systems Corporation, but this is immaterial to the Court's inquiry.

[10] It was not clear from Debtor's testimony whether he attempted the certification test a second time before his termination. Regardless, he did not receive the certification.

making $80-$120 per hour, but does not know how much additional time or training that would require. Trans. 40:19-41:6, 8-10. And because Debtor sought but failed to advance towards his goal of becoming a database builder in the 10 years since he began software support, he does not believe that further pursuing certification would be fruitful. Trans. 41:11-15.

After his unsuccessful attempt to become certified, Debtor returned to the work he was doing before taking the Epic position, but only until 2018 when the staffing agencies that Debtor worked or either went out of business or merged with others. Trans. 17:14-20.

Between 2015 and 2018, Debtor drove for Uber and Lyft between his work travel and staffing jobs to generate additional income. He began driving full time from 2018 until the arrival of the COVID-19 pandemic, which rendered him unable to carry passengers. Trans. 17:21-18:3. Convinced by Uber's marketing materials, Debtor purchased a 2011 Lexus IS250 (the "Lexus") on or around March 30, 2015, to generate additional fare revenue by offering rides in a luxury vehicle. ECMC Ex. 19; Trans. 47:18-48:6. After roughly a year, Debtor determined that there was limited demand for luxury rides and the cost of using the Lexus for his rideshare enterprise outweighed the benefits. Trans. 48:1-9. On or around December 22, 2017, Debtor purchased a 2016 Kia Soul (the "Kia") to use for rideshare gigs. ECMC Ex. 20; Trans. 48:7-17.

### Debtor's Income

The Court admitted into evidence copies of Debtor's tax returns establishing that he earned no income from 2019-2021, $10,183 in 2018, and $57,786 in 2017. Plaintiff's Exs. 1-5. Debtor offered no other documents into evidence establishing his income history, despite having previously filed with the Court numerous tax return transcripts containing the following

information:[11]

| Year | Earnings |
|------|----------|
| 2000 | $30,238 |
| 2001 | $18,712 |
| 2002 | $14,984 |
| 2003 | $14,592 |
| 2004 | $6,335 |
| 2005 | $11,327 |
| 2006 | $22,894 |
| 2007 | $14,860 |
| 2008 | $10,997 |
| 2009 | $6,700 |
| 2010 | $9,470 |
| 2011 | $5,453 |
| 2012 | -$6,915 |
| 2013 | $12,882 |
| 2015 | $31,271 |

Debtor's uncontroverted testimony was that his annual earnings averaged $15,000 per year from 2000 through 2020, and while the Court cannot consider the filed but not proffered tax transcripts as evidence, it is noteworthy that the amounts contained therein are consistent with Debtor's testimony. Trans. 18:9-15, 49:5-12; Doc. 22. Indeed, from 2000 to 2021, Debtor's income averaged $13,588.[12] On the Petition Date, Debtor's income was $3,899 per month, consisting of the following:[13]

| Source | Gross | Net |
|--------|-------|-----|
| Uber | $2,410.50 | $1,609.00 |
| Lyft | $1,461.00 | $904.00 |
| Postmates | $266.00 | $266.00 |
| Other Income | $1,120.00 | $1,120.00 |
| Total | $5,257.50 | $3,899.00 |

---

[11] *See* Doc. 22.

[12] Debtor provided no income information for 2014 or 2016, and those years are not included in this calculation.

[13] Trans. 30:21-32:8; ECMC Ex. 10.

At the time of Trial, Debtor's income was roughly $3,000 per month from his work for Uber Eats, DoorDash, Grubhub, GrowMe, and Walmart Spark. Trans. 50:2-7.

**<u>Debtor's Expenses and Liabilities</u>**

For almost 15 years, Debtor has lived in a 1900 square-foot house owned by his sister. Trans. 24:22, 36:5, 33:7-13. Debtor pays $1,197 in monthly rent to his sister, but she has waived rent in the past when Debtor could not afford it. Trans. 36:11-24. Debtor's mother lives both with Debtor and with Debtor's sister as they take turns caring for her, but the Court received no evidence regarding how long Debtor's mother lives in each place. Trans. 25:11-12.

Debtor scheduled: (i) secured debts in the amount of $26,000, secured by the Lexus and the Kia; (ii) unsecured priority debts in the amount of $27,304 (amended to $29,500 on December 2, 2021), consisting of unpaid tax liability to the Internal Revenue Service;[14] and (iii) non-priority unsecured debts in the amount of $423,083 (amended to $450,215 on December 2, 2021), consisting primarily of student loan debt and several sub-$1,000 debts. ECMC Exs. 17, 18; Bankruptcy Case, Docs. 1, 122. In May 2021, Debtor surrendered both the Lexus and the Kia to the respective creditors holding security interests in each. Trans. 34:7-9. During Debtor's ownership of the vehicles, the Kia accumulated over 150,000 miles and the Lexus accumulated over 70,000 miles. Trans. 48:16-22.

---

[14] Debtor's priority unsecured debts are the subject of an open adversary proceeding 21-05093.

Debtor's expenses have changed since the Petition Date:[15]

| Expense as of: | Petition Date | Amended Schedule J | Testimony at Trial |
|---|---|---|---|
| Rent | $1,197.00 | $0.00 | $1,200.00 |
| Utilities | $350.00 | $100.00 | $100.00 |
| Food and Housekeeping Supplies | $200.00 | $100.00 | $100.00 |
| Clothing, laundry, and dry cleaning | $0.00 | $0.00 | $0.00 |
| Personal Care | $50.00 | $20.00 | $20.00 |
| Medical and Dental | $0.00 | $0.00 | $0.00 |
| Transportation | $200.00 | $20.00 | $20.00 |
| Entertainment | $100.00 | $0.00 | $0.00 |
| Life Insurance | $30.00 | $30.00 | $30.00 |
| Health Insurance | $160.00 | $70.00 | $70.00 |
| Vehicle Insurance | $380.00 | $180.00 | $270.00 |
| Car Payments | $848.00 | $280.00 | $475.00 |
| Home Maintenance/repair/upkeep | $50.00 | $0.00 | $0.00 |
| HOA Dues | $10.00 | $0.00 | $0.00 |
| **Total** | **$3,575.00** | **$800.00** | **$2,285.00** |

## Loan Repayment Options

No evidence was offered at Trial regarding Debtor's monthly payments if required to repay the Loan. Currently, Debtor's Loan is subject to an income-based repayment program that requires Debtor to make no monthly payments. Trans. 52:4-7. But given the current Loan balance of approximately $250,000, even if no further interest accrued on the Loan, Debtor would have to pay over $1,000 per month for 20 years to pay off the Loan.

ECMC explained to Debtor prior to Trial that if the Court does not discharge the Loan, Debtor is eligible to participate in the U.S. Department of Education's Revised Pay as You Earn ("REPAYE") repayment program, and Debtor's monthly payments would be based on his income and family size rather than the size of the Loan. PTO ¶ 11(19-20); Trans. 37:23-38:21; ECMC Ex. 2 ¶ 2. Based upon the parameters of REPAYE, if Debtor's adjusted gross income remains

---

[15] Trans. 50:9-16; ECMC Exs. 14, 15.

consistent with his 2018-2021 average annual income, Debtor's payment under REPAYE would be $0 per month, and after 20 years of such payments, Debtor's loan debt would be cancelled. PTO ¶ 11(22-26, 30); Trans. 38:22-25, 39:1-9, 50:22-25; ECMC Ex. 2 ¶¶ 3, 4.

## CONCLUSIONS OF LAW

Student loans are not discharged in bankruptcy "unless excepting such debt from discharge will impose an undue hardship on the debtor and debtor's dependents." 11 U.S.C. § 523(a)(8). The Eleventh Circuit has adopted the *Brunner* standard for determining whether undue hardship exists. *Hemar Ins. Corp. Am. v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir. 2003); *see Brunner v. New York State Higher Educ. Servs Corp.*, 831 F.2d 395 (2d Cir. 1987). Under *Brunner*, Debtor has the burden to prove that:

1) he cannot maintain, based on current income and expenses, a minimal standard of living for himself and dependents if forced to repay the Loan;

2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant period; and

3) that he has made good faith efforts to repay the Loan.

*Brunner*, 831 F.2d at 396.

Debtor must prove all three elements of the *Brunner* test by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). If Debtor fails to prove just one element, the inquiry ends, and the Court will not discharge the Loan. *Gordon v. U.S. Dep't. of Educ.* (*In re Gordon*), Adv. Proc. No. 07-09049-MGD, 2008 WL 5159783, at *5 (Bankr. N.D. Ga. Oct. 10, 2008).

### I.   Minimal Standard of Living

To satisfy the first prong of the *Brunner* test, Debtor must prove that he cannot "afford the basic living necessities if forced to repay the loan." *Id*. at *6. "[S]helter, basic utilities, food and personal hygiene products, vehicles, and the costs associated with a vehicle, health insurance, and

some source of recreation" are necessary for a minimal standard of living. *Gordon*, 2008 WL
5159783, at \*6 (citing *Ivory v. U.S. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).
"[T]he Court must apply its common-sense knowledge gained from ordinary observation in daily
life and general experience to determine whether Debtor's expenses are reasonable and necessary."
*Id*. (quoting *Douglas v. Educ. Mgmt. Corp. (In re Douglas),* 366 B.R. 241, 253–54 (Bankr. M.D.
Ga. 2007)).

There is no real dispute that Debtor cannot afford to repay the Loan. ECMC concedes that
Debtor's income over the last several years is below 150% of the poverty level. ECMC's argument
that Debtor does not meet this first *Brunner* prong relies on his eligibility for the REPAYE program
with a $0 monthly payment. After 240 monthly payments of $0—assuming both that Debtor
remembers each year over the next 20 to reapply for REPAYE and that the REPAYE program
remains available—Debtor may have the Loan cancelled. In essence, ECMC argues that Debtor
can repay the Loan and maintain a minimal standard of living so long as he does not actually repay
the Loan. The Court agrees that Debtor could not maintain a minimal standard of living if forced
to make any actual payments on the Loan. As this Court has determined before, "the very reason
Debtor's payment amount would be zero-dollars a month under REPAYE is because []he cannot
afford to make payments on h[is] student loans and maintain a minimal standard of living." *Hill v.
Educ. Credit Mgmt. Corp. (In re Hill)*, 598 B.R. 907, 917 (Bankr. N.D. Ga. 2019).

This Court and others have rejected the notion that a debtor's eligibility for $0 payments
under REPAYE or other income-based repayment plans is a sufficient basis to find that a debtor
can repay student loans while maintaining a minimal standard of living. *Id*.; *see also* cases cited
therein. This and other courts have also reasoned that "having a zero-dollar payment is not
'repayment' at all because no payment is being made towards the principal balance, let alone

interest on the principal that continues to accrue." *Id.*

As of Trial, the Loan balance had grown to over $250,000. At the 8% interest rate shown on ECMC's Claim 6, assuming Debtor's enrollment in REPAYE with payments of $0 per month and interest accruing and capitalizing each year, the Loan balance will balloon to over $1.165 million in 20 years. In the last several years of payments (or non-payments, as it were), the Loan will accrue more interest annually than Debtor has ever earned in a single year. And waiting for Debtor, at the age of 77 after a 45-year saga in student loan repayment, are adverse tax implications. *See Hill,* 598 B.R. at 917.[16] This is not what the Bankruptcy Code requires of debtors.

Debtor's expenses are minimal. It is possible Debtor could spend less on vehicle costs, rent, or some other expense, but any savings would most certainly be exhausted by other categories of necessary expenses that Debtor currently sustains on a shoestring budget (i.e., food, medical/dental, personal care, etc.). While Debtor could conceivably redirect rent paid to his sister to repayment of his Loan, there is no indication that Debtor's sister would continue to waive Debtor's rent if Debtor's inability to pay is due solely to him paying the Loan. The past generosity of Debtor's sister does not dictate that Debtor could divert his rent payments to instead pay the Loan and still have a place to live. *See Wolfson v. DeVos (In re Wolfson)*, Nos. 19-11618 (LSS), 19-50717, 2022 Bankr. LEXIS 103, at *14 (Bankr. D. Del. Jan. 14, 2022) ("[T]he Brunner test demands inquiry into whether the debtor can support *himself as an individual*, and charity should not generally be considered income if it is necessary to maintain a minimal standard of living." (emphasis added)); *Hutsell v. Navient (In re Hutsell)*, Nos. 18-61474, 18-06038, 2020 Bankr.

---

[16] *See also Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 802 (B.A.P. 1st Cir. 2010) ("participation in [repayment programs] may not be appropriate for some debtors because of the impact of the negative amortization of the debt over time when payments are not made and the tax implications arising after the debt is cancelled").

LEXIS 618, at *16-17 (Bankr. N.D. Ohio Mar. 9, 2020) ("[A] debtor's receipt of charity from a third party who is under no legal obligation to provide such support should generally not be considered income for purposes of *Brunner*, when, without such support, the debtor cannot maintain a minimal standard of living and repay her loans.").

Debtor's testimony at Trial suggests a $700 surplus each month, but the Court questions whether Debtor's budgeted amounts for food, clothing, personal care, utilities, and dental and medical expenses are sufficient to meet his basic needs. In any event, a $700 per month "surplus" is insufficient to cover the compounding interest accruing on the Loan and the monthly payments that would be required to repay the Loan within Debtor's lifetime.

"The test under *Brunner* is not whether Debtor would be able to maintain a minimal standard of living if []he made payments under REPAYE . . . . Rather, the test is whether Debtor can maintain a minimal standard of living if []he is forced to repay the actual outstanding student debt." *Hill*, 598 B.R. at 918. *See also Brooks v. Educ. Credit Mgmt. Corp (In re Brooks)*, 406 B.R. 382, 393 (Bankr. D. Minn. 2009) ("the inquiry is to the debtor's ability to repay the loan, not simply to make payments"). There is no doubt that Debtor's current income is insufficient to repay the Loan while maintaining a minimal standard of living. Debtor has satisfied the first prong of *Brunner*.

## II.    Persistent State of Affairs

The second prong of *Brunner* requires that a debtor show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396 (2nd Cir. 1987). "The debtor must show with a 'certainty of hopelessness' that h[is] financial condition will not improve in the future." *Hill*, 598 B.R. at 918 (citing *Gordon*, 2008 WL 5159783, at *5). The "additional circumstances"

include the debtor's (and their dependents') age, education, work and income history (including underemployment), physical and mental health, disabilities, job skills, assets that could be used to repay the loans, potentially increasing expenses, and lack of better financial options elsewhere.[17] Courts generally find these factors must be beyond the debtor's control and not self-imposed. *See, e.g., Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005) (these factors should be "beyond the debtor's control, not borne of free choice" such as choosing a low-paying job).

Courts also consider whether a debtor's job prospects are foreclosed. For example, one court determined that a debtor who could not pass a professional exam to better her prospects had a "total foreclosure of job prospects in her area of training" that showed a "certainty of hopelessness." *McGinnis v. Pa. Higher Educ. Assistance Agency (In re McGinnis)*, 289 B.R. 257, 266-7 (Bankr. M.D. Ga. 2003). If a debtor chooses a career in which his or her salary is capped or below median (as opposed to being forced into that career by factors such as a lack of education), his or her job prospects are not generally deemed "foreclosed." *See, e.g., Oyler*, 397 F.3d at 386 (debtor's choice of a lower-paying job did not foreclose future earnings prospects). If a debtor has a history of seeking employment and fails because of factors beyond his or her control, however, it indicates that his or her job prospects may be foreclosed. *Hoskins v. Educ. Credit Mgmt. Corp.*, 292 B.R. 883, 888 (C.D. Ill. 2003) (the debtor's consistent efforts to obtain employment weighed in his favor).

Notwithstanding living with Type II diabetes, Debtor has not claimed that any health

---

[17] *See, e.g., In re Clark*, No. 15-42603-BEM, 2021 WL 5702705, at *10 (Bankr. N.D. Ga. Nov. 29, 2021) ("a court should consider factors such as the debtor's age, age of the debtor's dependents, debtor's education, work and income history, physical and mental health, and other relevant circumstances") (quoting *Douglas v. Educ. Mgmt. Corp. (In re Douglas)*, 366 B.R. 241, 256 (Bankr. M.D. Ga. 2007); *Educ. Credit Mgmt. Corp. v. Nys (In re Nys)*, 446 F.3d 938, 947 (9th Cir. 2006) (identifying job skills, underemployment, debtor's assets, potential for increased expenses, and lack of better options elsewhere as additional factors).

condition will impact his ability to pay the Loan in the future. Debtor's age is, however, a significant factor. The more productive years a debtor has remaining, the less his age weighs in his favor. *See Graddy v. Educ. Credit Mgmt. Corp.*, 615 B.R. 336, 350 (N.D. Ga. 2020) (debtor did not meet second *Brunner* prong where she was a licensed attorney with "many years of productivity ahead of her"). Debtor was 57 years old at the time of Trial. While he still has several years before he reaches retirement age, Debtor's productive, working years may easily be in the single digits.

Debtor obtained a degree in Management from Temple and a degree in Human Resources from DeVry, but neither of his degrees have been germane to his employment over the past 25 years. ECMC's argument that Debtor has the potential to increase his income by becoming a database builder depends solely upon Debtor's ability to obtain a specialized certification—a process that Debtor's uncontroverted testimony indicated could take up to a year and that Debtor previously failed to complete successfully. There is no evidence that Debtor could improve his employability without the certificate, nor was any evidence presented regarding the current job market for workers with the certification. It is pure speculation on ECMC's part that pursuing the certification that Debtor failed to obtain almost 6 years ago would be a fruitful endeavor. And Debtor's management degree, earned 25 years ago, holds little value to begin an entirely new career at age 57 with no prior management experience.

Debtor's situation here is not so different than the debtors in *McGinnis* and *Hoskins*. Debtor has never worked in a field related to his degrees. Debtor has tried and failed to obtain certification as a database builder. Debtor worked in the same field for ten years and then drove for Lyft, Uber, Postmates, and other "gig work" companies. Debtor experienced some success in temporary placements, but none led to long-term job prospects. Debtor sacrificed some pay for the

opportunity to obtain a promising software certification, but he was fired when he failed to complete the certification on an expedited basis. There is no evidence that Debtor languished in these positions while eschewing better opportunities. To the contrary, Debtor testified that he has applied to 5,000 to 10,000 jobs over the years, constantly seeking advancement until he resigned himself to gig work a few years ago.

Debtor's schedules show that he has no assets available to repay his Loan, and there was no evidence produced at Trial to the contrary. Inflation is on the rise, indicating a strong likelihood that Debtor's expenses will increase.[18] Debtor has no dependent children, but he and his sister share the responsibility of caring for his mother. This responsibility is likely to become more, not less, demanding over time as his mother ages, leaving fewer resources for Debtor to devote to looking for work and trying to repay the Loan.

The Court cannot say why Debtor has not had more success in his career despite his degrees and work ethic. But past performance is an indicator of future success, and Debtor's work and income history over the past 25 years, coupled with the lack of any concrete job prospects or even an obvious field within which Debtor should work, demonstrates that Debtor's circumstances will persist. Debtor has satisfied the second prong of *Brunner*.

### III.    Good Faith Efforts to Repay the Loan

Last, the Court must consider Debtor's good faith efforts to repay the Loan. The good faith prong of the *Brunner* test scrutinizes pre-bankruptcy conduct of the debtor, incorporating the equitable doctrine of "unclean hands" to evaluate the eligibility of a debtor for discharge of their student debts.[19] The good faith prong itself is a three-part non-dispositive test requiring the debtor

---

[18] *See* Consumer Price Index, https://www.bls.gov/cpi/. The Court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2).

[19] Rafael I. Pardo & Michelle R. Lacey, The Real Student-Loan Scandal: Undue Hardship Discharge Litigation, 83

to show attempts to: (1) gain employment, (2) maximize income, and (3) minimize expenses. *Mosley*, 494 F.3d at 1327; *Wolfe v. United States Dep't of Educ. (In re Wolfe)*, 501 B.R. 426 (M.D. Fla. 2013). The debtor must also show his financial condition was not willfully or negligently self-inflicted, but rather a result of factors beyond his control. *Hill*, 598 B.R. at 920 (citing *Mosely*, 494 F.3d at 1327). This test-within-a-test is often misread by courts to be far more scrutinous than *Brunner* intended. *Rosenberg v. N.Y. State Higher Educ. Servs. Corp. (In re Rosenberg)*, 610 B.R. 454 (Bankr. S.D. N.Y. 2020).

ECMC argues that Debtor failed to make a good faith effort to repay the loans by never making a single payment nor taking advantage of the administrative relief available to him. The Court disagrees.

### A. Debtor Has Shown Good Faith Efforts to Gain Employment

Showing good faith efforts to seek employment does not require the debtor to be employed. In fact, it does not even require the debtor to be actively seeking employment. *Hill*, 598 B.R. at 919 (citing *Adams v. Educ. Credit Mgmt. Corp. (In re Adams)*, 2016 Bankr. LEXIS 4601, 2016 WL 8943802, at *5 (Bankr. N.D. Ga. Nov. 18, 2016); *Williams v. United State Dep't of Educ. (In re Williams)*, 2018 Bankr. LEXIS 665 (Bankr. N.D. Ill. March 8, 2018). What is required is that the debtor take reasonable steps within their abilities to find employment, such as working outside of their chosen field or finding work through "gig work" jobs such as driving for ride-share companies. *Wolfson v. DeVos (In re Wolfson)*, Nos. 19-11618 (LSS), 19-50717, 2022 Bankr. LEXIS 103 (Bankr. D. Del. Jan. 14, 2022). Long-term efforts to find work, even when unsuccessful, satisfy the good faith standard. *Id*. at *6-7. Courts have acknowledged the snowball effect under-employment and unemployment has on career prospects for debtors. *Id.* The standard

Am. Bankr. L.J. 179 (2009).

is not whether a debtor gets a "professional" job in their field of study; the standard is whether a debtor made material efforts to gain and maintain *any* form of employment appropriate for their specific situation.

The record reflects that Debtor made good faith efforts to maintain employment. Debtor's uncontradicted testimony established that Debtor has generally maintained employment since his graduation and that Debtor's loss of employment at various times was due to factors outside Debtor's control, including the COVID-19 pandemic. Debtor's testimony evinced several attempts to build a career in numerous industries. Each of these career-building efforts were cut short by factors such as mergers, life events, patently unrealistic expectations, and industry-wide contractions. Debtor is now 57 years old, and it is unrealistic to expect Debtor to start from scratch and build a lucrative professional career. Currently, Debtor drives for several rideshare and delivery companies and maintains an income on par with his previous jobs. Therefore, Debtor has made a good faith effort to seek and maintain employment.

### B. Debtor Has Made a Good Faith Effort to Maximize His Income

There is no absolute requirement that a debtor "maximize...income for the benefit of creditors" to receive a discharge of student loans. *Vermaas v. Student Loans of North Dakota (In re Vermaas)*, 302 B.R. 650, 660 (Bankr. D. Neb. 2003). The requirement is only that the debtor make a good faith effort to maximize income. *Mosely*, 494 F.3d at 1327. The good faith effort does not require debtors to toil away in bad environments or maintain jobs that offer them no chance to advance in their career. *Wolfson*, 2022 Bankr. LEXIS 103 at *6-7. For instance, a debtor leaving a "traditional" job to drive for ride-share and delivery companies full-time may still meet the requirement for a debtor to continue maximizing his income. *Id.*

Based on his Trial testimony, Debtor has made a good faith effort to maximize his income.

Debtor has a substantial working history across several industries and numerous companies. Debtor repeatedly lost jobs and opportunities for advancement through no fault of his own. Debtor's uncontroverted testimony was that his average income between 2000 and 2020 was less than $15,000 a year. Debtor's highest income was roughly $57,000 while working for HCTec in 2017. But Debtor left that job for a more promising opportunity at Epic, which did not pan out through no fault of his own.

It appears that Debtor's income thrice exceeded $30,000 per year. Once when working for Verizon Wireless in 2000, and in 2015 and 2017 while providing software support. But even considering only the tax returns submitted into evidence, Debtor's sworn schedules, and Debtor's testimony, Debtor earning $30,000 or more in a year is an exception to the norm—and his 2017 income of $57,786 an anomaly in the extreme. Debtor currently grosses roughly $3,000 a month, which puts him well above his average annual income for most of his career. Therefore, Debtor has made a good faith effort to maximize his income.

### C.  Debtor Has Made a Good Faith Effort to Minimize His Expenses

Finally, the requirement to minimize expenses requires a showing that the debtor has taken steps to decrease their daily living costs. *Nixon v. Key Educ. Resources (In re Nixon)*, 453 B.R. 311 (Bankr. S.D. Ohio 2011). Minimizing expenses requires neither that a debtor live in poverty nor that he implement a "penny pinching" approach of seeking out and slashing expenses.[20] *Id.* at 328-329.

The Court concludes that Debtor has made good faith efforts to minimize his expenses. For 15 years, Debtor has lived in a house owned by his sister, who waives rent when he cannot afford

---

[20] For example, the debtors in *Nixon* could have saved $100 to $200 a month if they sold their home and rented, but the Court found that such steps were not necessary based on the prevailing housing market. *Nixon.* at 328-329.

it. In the past, Debtor owned two vehicles simultaneously, including the Lexus, which was for the sole purpose of generating additional revenue from Uber. Once Debtor determined that the Lexus was not bringing in the income he anticipated, Debtor purchased a more economical car, and has since surrendered both high-mileage vehicles in the Bankruptcy Case. Debtor now owns one vehicle with a $475 monthly payment and monthly insurance premiums of $270 (down from $848 and $380, respectively, on the Petition Date). These expenses are necessary as his income is derived from driving for rideshare and delivery services.

Debtor's budgets for telecommunication services, utilities, food, clothing, and dental and medical services are minimal—perhaps unrealistically so.[21] If accurate, however, they show that Debtor has gone to extremes to minimize these expenses. Therefore, Debtor has made a good faith effort to minimize his expenses.

### D. Debtor Does Not Need to Have Made a Payment on the Loan

Finally, the Court must address ECMC's argument that Debtor has not acted in good faith as he has not made any payments on the Loan.[22] This Court has previously held that "failure to make a payment, standing alone, does not establish a lack of good faith." *Hill*, 598 B.R. at 920-921 (quoting *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302, 1311 (10th Cir.

---

[21] Based upon its review of the evidence, including Debtor's testimony at Trial, the Court believes any inaccuracies in Debtor's expenses to result from Debtor's optimism or myopia focusing on the previous month's expenses and not any attempt to mislead the Court or ECMC.

[22] To the extent that ECMC has argued that Debtor lacks good faith because he has not elected to participate in the REPAYE program, the Court disagrees. Debtor is already participating in an income-based repayment program, but regardless, failure to participate in an income contingent repayment program is not *per se* bad faith. *Hill*, 598 at 921 (citing *Mosley*, 494 F.3d at 1327); *see also Cleveland v. Educ. Credit Mgmt. Corp., et al. (In re Cleveland)*, 559 B.R. 265, 273 (Bankr. N.D. Ga. 2016); *Macon v. U.S. Dep't of Educ. (In re Macon)*, Adv. Proc. No. 13-4014-PWB, 2014 Bankr. LEXIS 4308, 2014 WL 5080410, at *4 (Bankr. N.D. Ga. Oct. 6, 2014). Requiring a debtor to make a "continuous effort" to repay student loans through an administrative program creates an absurd result where the debt is never dischargeable since doing so would "graf[t] a regulatory requirement (participation in an administrative program) on to § 523(a)(8) that simply does not exist and undermines this Court's ability to examine whether all of Debtor's circumstances support a finding of 'undue hardship.'" *Macon*, 2014 Bankr. LEXIS 4308, 2014 WL 5080410, at *4 (citing *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 920 (9th Cir. B.A.P. 2013); *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013)).

2004)).

The evidence at Trial confirmed that Debtor has never made a payment on the Loan. ECMC's counsel indicated that Debtor was participating in an income-based repayment program at the time of Trial and there was no evidence that Debtor was ever in default on the Loan. Despite having a few years of income in excess of $30,000, given the Loan's "good standing" status, the Court can only surmise that Debtor was not required to make payments on the Loan during those years as a result of his participation in either the income-based repayment program or some other deferment or forbearance granted by the servicer. Regardless, *Brunner* requires a showing of good faith *efforts* to repay a student loan. Whether a debtor has made payments on his or her student loans is not a factor under *Brunner*. Here, Debtor has shown good faith efforts to repay the Loan notwithstanding the lack of actual payments.

## CONCLUSION

Debtor has shown by a preponderance of the evidence that repayment of his Loan would impose an undue hardship. The evidence clearly established that Debtor cannot maintain a minimal standard of living if he is forced to repay the Loan. The evidence also established that this state of affairs is likely to persist for a significant portion of the repayment period. Despite not having made any payments on the Loan, Debtor has shown substantial attempts to gain employment, maximize his income, and minimize his expenses, and has never been in default on the Loan. For these reasons, Debtor is entitled to a hardship discharge of the Loan under 11 U.S.C. § 523(a)(8). Accordingly, it is

**ORDERED** that judgment is for Debtor.

### END OF DOCUMENT

**DISTRIBUTION LIST**

Paul Roland Savage
2397 Cove Lake Road
Lithonia, GA 30058

Educational Credit Management Corporation
c/o Samuel C. Joyce
Jones Cork, LLP
PO Box 6487
Macon, GA 31208-6437

Thomas W. Joyce
Jones, Cork & Miller LLP
435 Second Street
P. O. Box 6437
Macon, GA 31208-6437